

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 16, 2017

**BY ECF**
The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    **United States v. Kevin Lewis**,
                16 Cr. 396 (GHW)

Dear Judge Woods:

      The Government submits this letter in connection with the sentencing of defendant Kevin Lewis, scheduled for October 18, 2017. As more fully set forth below, the plea agreement between the parties (the "Plea Agreement") calculated a United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range of 151 to 181 months' imprisonment (the "Guidelines Range"). The United States Probation Department ("Probation") has come to the same calculation in the Presentence Investigation Report ("PSR"). The Government respectfully submits that a sentence within the Guidelines Range is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## Indictment and Guilty Plea

      On June 8, 2016, a grand jury sitting in this District returned Indictment 16 Cr. 396 (GHW) (the "Indictment"), charging Lewis and twenty-one other defendants with narcotics and firearms offenses. On the same date, a grand jury sitting in this District returned Indictment 16 Cr. 397 (LTS), in which an additional ten defendants were charged with participating in a narcotics conspiracy related to the conspiracy charged before Your Honor, as detailed below.

      Lewis was charged in Count One with conspiring to distribute, and possess with the intent to distribute, 280 grams and more of crack cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A). On July 19, 2017, Lewis appeared before Your Honor and pleaded guilty, pursuant to the Plea Agreement, to the lesser-included offense on Count One of conspiring to distribute, and possess with the intent to distribute mixtures and substances containing a detectable amount of crack cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C).

## Background of the Lincoln Houses Drug Trafficking Organizations

In or about January 2015, the New York City Police Department (the "NYPD") and the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") began investigating drug trafficking and related firearms offenses, going back to as early as 2008, in the area of the Lincoln Housing Development (the "Lincoln Houses") in Manhattan, New York. (PSR ¶ 8). Through this investigation, law enforcement identified two related drug-trafficking crews in the Lincoln Houses: one dominating the East Side of the Lincoln Houses (the "East Side Crew") and one dominating the West Side of the Lincoln Houses (the "West Side Crew"). (PSR ¶ 9). Members of the East Side Crew were ultimately charged in 16 Cr. 397 (LTS), which is proceeding before the Honorable Laura Taylor Swain, and members of the West Side Crew were ultimately charged in the instant case before Your Honor.

The East and West Side crews operated 24/7 crack-sale operations in the Lincoln Houses. Over the course of approximately 18 months, the NYPD engaged in more than 200 controlled purchases of crack across the East and the West Sides. Notably, in that time period, an undercover officer ("UC") was never turned away for lack of supply—if a dealer ran out of crack, he would pool his supply with his co-conspirators. It was a round-the-clock operation. (PSR ¶ 9).

While these two crews generally distributed crack separately on their respective sides, there were members of each crew that were permitted to cross over and sell on each side of the Lincoln Houses. Moreover, members of each crew protected each other's right to sell exclusively in Lincoln. Outsiders were not allowed. (PSR ¶ 10).

In particular, on the West Side, this protection was done through violence and use of firearms. Firearms were held directly by individuals and were also placed strategically throughout the West Side so that members of the conspiracy would have easy access. These firearms were left in places such as garbages, scaffolding, and the grass—communal spaces also shared by children and other residents. (PSR ¶ 11). The West Side Crew further engaged in violent rivalries with neighboring housing development drug crews. (PSR ¶ 12). These rivalries have resulted in shootings and violence that have terrorized that community.

Moreover, in addition to the violence linked to these drug organizations, the East and West Side Crews have interfered with the lives of law-abiding residents of the Lincoln Houses on a daily basis. Most of the crack sales made to the UCs were made in elevators, stairwells, lobbies, and public hallways. The videos of certain of these sales show the defendants slinging crack while surrounded by children in public spaces at all times of day and night. (PSR ¶ 13). Residents of the Lincoln Houses could not enter or exit certain buildings without running into these crack sale operations.

Had Lewis proceeded to trial, the Government was prepared to offer evidence including but not limited to (i) the testimony of at least two cooperating witnesses; (ii) the testimony of local and federal law enforcement officers; (iii) narcotics, a firearm, and ammunition seized from various defendants; (iv) audio and video recordings made during controlled purchases of narcotics from Lewis and other defendants; (v) cellular telephone records; (vi) photographs; and (vii) records from social media websites such as YouTube.

## Lewis's Offense Conduct

Lewis has accepted responsibility for selling between 112 and 196 grams of crack as part of his participation in this conspiracy. During the course of this investigation, an NYPD UC observed Lewis sell 8 twists of crack to a confidential informant on one occasion. Moreover, had the case proceeded to trial, the Government would have presented witness testimony that Lewis sold crack in Lincoln on a daily basis over years of time, and handed out crack for other members of the conspiracy to sell in Lincoln.

Lewis has also accepted responsibility for possession of a firearm in connection with his involvement in the drug conspiracy. Indeed, at least two cooperating witnesses observed Lewis with a firearm on separate occasions, and Lewis had a reputation in Lincoln for being violent and being a "holster," or someone who regularly carried a gun to protect members of the drug crew.

## The Guidelines Calculation

Based on the criminal history set out below, Lewis is a Career Offender under the Guidelines, and thus has a base offense level of 32. After a three-level reduction for acceptance of responsibility, Lewis's applicable offense level is 29. Based on the convictions and sentences set out below, Lewis has 13 criminal history points. In any event, he is in criminal history category VI based on his Career Offender status.

1. On or about August 19, 2015, the defendant was convicted in Supreme Court, Bronx County, of Attempted Robbery in the Third Degree, a felony, in violation of New York State Penal Law Section 160.05, and was sentenced to a term of eighteen to thirty-six months' imprisonment. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in three criminal history points. (PSR ¶ 69).

2. On or about August 20, 2015, the defendant was convicted in Supreme Court, New York County, of Aggravated Criminal Contempt, a felony, in violation of New York State Penal Law Section 215.52, and was sentenced to a term of thirty to sixty months' imprisonment. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in three criminal history points. According to the NYPD arrest report, the defendant was arrested after he attacked a victim by pulling her hair, slamming her head against a gate, and attempting to choke her. The victim suffered abrasion to her right hand and complained of substantial pain to the back of her head. These actions were all in violation of a protective order against the defendant. (PSR ¶ 68).

3. On or about October 15, 2014, the defendant was convicted in New York County Criminal Court of Criminal Mischief with Intent to Damage Property, a misdemeanor, in violation of New York State Penal Code Section 145.00, and was sentenced to ten days' imprisonment. Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point. According to the NYPD arrest report, the defendant kicked in the door of a victim. (PSR ¶ 67).

4. On or about June 29, 2010, and in relation to an arrest on January 5, 2010, the defendant was convicted in Supreme Court, New York County, of Attempted Criminal Possession of a Controlled Substance in the Third Degree, a felony, in violation of New York State Penal Law Section 220.16, and was sentenced to five years' imprisonment. Pursuant to U.S.S.G. §

3

4A1.2(a)(1), because this constitutes conduct that is part of the instant offense, this sentence results in no criminal history points. According to the NYPD arrest report, the defendant was observed by an undercover officer to be in possession of a controlled substance. (PSR ¶ 66).

5. On or about June 29, 2010, and in relation to an arrest on August 26, 2009, the defendant was convicted in Supreme Court, New York County, of Attempted Criminal Possession of a Controlled Substance in the Third Degree, a felony, in violation of New York State Penal Law Section 220.16, and was sentenced to five years' imprisonment. Pursuant to U.S.S.G. § 4A1.2(a)(1), because this constitutes conduct that is part of the instant offense, this sentence results in no criminal history points. According to the NYPD arrest report, the defendant sold a quantity of a controlled substance to an undercover officer. (PSR ¶ 65).

6. On or about October 2, 2009, the defendant was convicted in New York County Criminal Court of False Personation, a misdemeanor, in violation of New York State Penal Law Section 190.23, and was sentenced to time served. Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point. According to the NYPD arrest report, after being found in possession of an open container of alcohol, and after being advised of the consequences of providing false information, the defendant provided a fake name to law enforcement. (PSR ¶ 64).

7. On or about February 11, 2009, the defendant was convicted in New York County Criminal Court of Criminal Trespass in the Second Degree, a misdemeanor, in violation of New York State Penal Law Section 140.15, and was sentenced to ten days' imprisonment. Pursuant to U.S.S.G. § 4A1.2(c)(1), this sentence results in no criminal history points. (PSR ¶ 63).

8. On or about November 9, 2008, the defendant was convicted in New York County Criminal Court of Criminal Possession of Marijuana in the Fifth Degree, a misdemeanor, in violation of New York State Penal Law Section 221.10, and was sentenced to three days' imprisonment. Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point. (PSR ¶ 62).

9. On or about April 17, 2008, the defendant was convicted in New York County Criminal Court of Resisting Arrest, a misdemeanor, in violation of New York State Penal Law Section 205.30, and was sentenced to seven days' imprisonment. Pursuant to U.S.S.G. § 4A1.2(c)(1), this sentence results in no criminal history points. According to the NYPD arrest report, the defendant was found in possession of crack cocaine and fled from the police at the time of his arrest. (PSR ¶ 61).

10. On or about March 1, 2008, the defendant was convicted in New York County Criminal Court of Criminal Possession of Marijuana in the Fifth Degree, a misdemeanor, in violation of New York State Penal Law 221.10, and was sentenced to time served. Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point. (PSR ¶ 60).

11. On or about January 16, 2008, the defendant was convicted in New York County Criminal Court of Criminal Trespass in the Second Degree, a misdemeanor, in violation of New York State Penal Law Section 140.15, and was sentenced to time served. Pursuant to U.S.S.G. §

4A1.2(c)(1), this sentence results in no criminal history points. According to the NYPD arrest report, the defendant entered a building in the Lincoln Houses with an individual who was observed purchasing narcotics. When asked by police, the defendant would not advise the officers who he was there to see. (PSR ¶ 59).

12. On or about March 23, 2007, the defendant was convicted in Supreme Court, Bronx County, of Introducing Contraband into Prison, a misdemeanor, in violation of New York State Penal Law Section 205.20, and was sentenced to time served. Because the defendant has already received the maximum four points under U.S.S.G. § 4A1.1(c), this sentence results in no criminal history points. According to the NYPD arrest report, the defendant was found in possession of marijuana while visiting an inmate at a correctional facility. (PSR ¶ 58).

13. On or about October 27, 2005, the defendant was convicted in New York County Criminal Court of Criminal Possession of a Controlled Substance in the Seventh Degree, a misdemeanor, in violation of New York State Penal Law Section 220.03, for which he received a conditional discharge. Because the defendant has already received the maximum four points under U.S.S.G. § 4A1.1(c), this sentence results in no criminal history points. According to the NYPD arrest report, the defendant was observed in possession of nine bags of crack, one of which the defendant swallowed upon his arrest. Although the defendant was initially sentenced to a conditional discharge, following two bench warrants, the defendant was resentenced to ten days' imprisonment. (PSR ¶ 57).

14. On or about February 22, 2005, the defendant was convicted in New York County Criminal Court of Criminal Trespass in the Second Degree, a misdemeanor, in violation of New York State Penal Law Section 140.15, and was sentenced to time served. Pursuant to U.S.S.G. § 4A1.2(c)(1), this sentence results in no criminal history points. (PSR ¶ 56).

15. On or about May 28, 2002, the defendant was convicted in Supreme Court, New York County, of Attempted Robbery in the Second Degree, a felony, in violation of New York State Penal Law Section 160.10, and was sentenced to a term of two years' imprisonment. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in three criminal history points. According to the NYPD arrest report, the defendant punched and kicked a victim after the victim refused to turn over money to the defendant and others. (PSR ¶ 55). After a parole violation, the defendant was sentenced to an additional two years' imprisonment. The defendant was again paroled, again violated that parole, and was again sentenced to two years' imprisonment. (PSR ¶ 55).

## Discussion

*Applicable Law*

Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005). "Pursuant to the 'remedy opinion' [in *Booker*], the now advisory Guidelines are to be considered

together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences." *United States* v. *Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *see also Booker*, 543 U.S. at 261-62. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings, *id.* at 49. *See also United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'" (quoting *United States* v. *Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en banc*))); *see also Fernandez*, 443 F.3d at 33-34 ("It was not error for the [District Court] to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted 'lighten[ing]' of . . . or fashioning of 'an alteration to' . . . the advisory Guidelines sentence").

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Fernandez*, 443 F.3d at 27; *see also Kimbrough* v. *United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" (quoting *Rita* v. *United States*, 551 U.S. 338, 350-51 (2007))).

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
> (5) any pertinent policy statement [issued by the Sentencing Commission];

>    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>    (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

*Application*

In light of the circumstances of the instant offense and the defendant's history, a sentence within the Guidelines Range of 151 to 181 months' imprisonment is appropriate. The 18 U.S.C. § 3553(a) factors particularly relevant here include the need to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, and protect the public from further crimes by the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C).

The offense conduct at issue, and the manner in which it was perpetrated here, is undoubtedly serious, and warrants a sentence within the Guidelines Range. The defendant participated in a round-the-clock crack-sale operation in a residential housing development. With over 30 members operating throughout both sides of the Lincoln Houses, the Houses were overrun with crack sales, crack use, and violence. Residents in the Lincoln Houses could not walk through their hallways, use their elevators, or access communal areas without being confronted by crack dealers and users. Indeed, some public areas became off-limits to the law-abiding citizens of the Lincoln Houses. The defendant's conduct lies at the heart of this scourge on the Lincoln Houses in his direct sales of crack to customers across several years and his provision of crack to others to sell.

Moreover, members of the conspiracy exposed innocent residents of the Lincoln Houses to dangerous conditions. Members of the conspiracy kept firearms in public places, including garbage cans and grassy areas within reach of children and other residents, and invited violence by engaging in turf wars with drug-dealing crews from neighboring housing developments. The defendant, himself, contributed to this danger by carrying firearms, and selling drugs while having access to firearms so he could protect this drug business.

Further, a sentence within the Guidelines Range is necessary to afford adequate specific and general deterrence. Lewis stands out from his co-defendants who have been sentenced to this point as having an extraordinary criminal history. Lewis is a career offender in the truest sense of the term—indeed, based on his decade of disregard for the law and the safety of others, Lewis is in Criminal History Category VI regardless of whether the career offender guidelines are applied (and even that calculation gives Lewis the benefit of not receiving criminal history points for the crimes he committed as part of his membership in the conspiracy charged here). At only 31 years old, Lewis has had sustained fifteen convictions, including five felony convictions. In the course of his criminal history, Lewis has demonstrated his contempt for the law in every conceivable way—from repeated violations of parole, to violations of protective orders, to carrying narcotics into prison facilities, to lying to law enforcement, to resisting arrest, to ignoring court orders of appearance, to returning to criminal conduct again and again after serving terms of imprisonment. This history raises substantial concerns about Lewis's likelihood of recidivism. A sentence within the Guidelines Range is necessary to ensure that Lewis does not again return to this path of criminal behavior.

Of further concern here is Lewis's efforts to minimize his conduct in advance of sentencing. Lewis states to the Court that he sold twelve bags of crack as a member of this conspiracy. This, of course, only captures the crack that Lewis was caught red-handed selling to law enforcement, and not the years he spent selling crack in Lincoln and protecting the crack sales of others. Indeed, Lewis's criminal history includes two prior narcotics convictions as relevant conduct for arrests in 2009, and convictions from 2008 and 2005 involving crack sales. Is the Court to believe, even considering the time the defendant spent in prison, that the defendant sold twelve bags of crack across an eight-year period? This is certainly inconsistent with Lewis's demonstrated criminal history and the information from cooperating witnesses, who detail Lewis's regular sales of crack in Lincoln across years of time and provision of crack to others in Lincoln to sell.

Finally, the Court's imposition of a sentence within the Guidelines Range in this case could send a message to others similarly situated to the defendant, who may be contemplating similar criminal acts. New York City's housing developments are plagued by drug crews similar to the West Side Crew. A sentence within the Guidelines Range will show that any participation in such a conspiracy is a serious offense that carries substantial consequences.

## **Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence within the Guidelines Range of 151 to 181 months' imprisonment.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By: /s/
Amanda L. Houle
Jason M. Swergold
Assistant United States Attorneys
Southern District of New York
(212) 637-2194 / 1023

cc: Defense counsel (via ECF)